This morning please. Ms. Watson. 16-3172. All right. Will counsel please approach? And would you please tell us your name and who you represent? My name is Stephen Boddy. I represent, I'm Richard Vartek with me, and I represent the defendant, appellant, Vivian Lamont. Michael Minton of the Minton Law Firm. We appointed a special prosecutor in this matter on behalf of the people of the state of Illinois representing the appellate. All right. And I will tell you both that we have read your briefs so we're familiar with the background of the case. The microphone that's in front of you is for recording purposes only. And so if you would both keep your voices up so that we can all hear you. And, Mr. Boddy, how much or I'll ask you, Mr. Boddy, first, who, how much time would you like for argument? I think I could, depending on the questions that the Court asks, I could speak in between 10 and 15 minutes. Okay. And a few minutes for rebuttal? Sure. All right. And Mr. Minton? Yes, Your Honor. I would like a 20 minute rebuttal. 20 minutes. All right. All right. And, Mr. Boddy, Mr. Minton, if you'd have a seat. Thank you. May it please the Court? What we have in this case is a victim of domestic abuse becoming a criminal by speaking up for herself and asking for protection from her attacker. But she asked for that protection how many months after it occurred? Three months. And in that time, other things were going on, including the divorce proceedings. The divorce was filed, and if I may find that, the divorce was filed closer to the time that she brought the criminal proceedings. There was a three-month lag, and the only testimony we have about the three-month lag was at the sentencing hearing. The reason there was a three-month lag is because her husband was out of the country, and she didn't pursue anything at that time because she didn't have to. Well, my understanding is that the petition for dissolution was filed on July 31st. Is that correct? Correct. And the domestic abandonment charges occurred on May 11th? Correct. So that was well before? Well before, correct. And this all occurred after there were two orders of regarded visitation? There were two orders of visitation. That were in place? That is correct. There were two orders of visitation. Did she tell the police about that? That's the only order of visitation. Is there anything in the record that shows she told the police? About the orders of visitation? Yes. I do not think there's anything in the record that she told the police about the orders of visitation. Did she tell the judges, the divorce judges, about the orders of protection? Right. Or the arrests? About the arrests? Uh-huh. Well, I'm sorry. Or when she was in front of the divorce judges, did she say, oh, yeah, I had my husband arrested? When he came to visit the children? When the husband came to visit the children, there was nothing pending. She was in front of the divorce judge. She came on a Saturday. She didn't go into divorce court and tell him anything. Well, they were in court on the 18th of September. He was arrested on the 19th, right? Correct. Right. So on the 18th of September, Ms. Mumadi certainly had the opportunity to tell the judge, by the way, I have contacted the police department about the domestic battery charges, and there is an outstanding warrant for my husband's arrest. She certainly did. But she didn't say anything. She doesn't have to say anything because this is a criminal case that is brought against her. She doesn't have to say anything. She has a presumption. There was no criminal case at that time against her. No, the criminal case was right after that. Right. So I understand. Why wouldn't she have to say something? She was the victim in her domestic battery case. Yes. So why wouldn't she have to tell? I don't think there was any obligation on her to tell the civil judge anything about a criminal case. Except for the fact that if she had told him she was fearful for herself or for her children, he might have drafted a different visitation order. So it makes sense to tell him. She did bring a petition for order of protection on the same day as an emergency, and the judge deemed that it was not an emergency. Well, it was ultimately on the 18th. Her order of protection was dismissed with prejudice and with leave to seek sanctions by the other side. Correct. So on the 18th, she knew she had no order of protection. She wasn't going to get one. And she knew that there was a warrant out for her husband's arrest and that he's going to show up the next day to pick up their son. Correct. All right. So maybe she didn't have a legal obligation to say anything, but wouldn't a reasonable person in her circumstance tell the trial judge, by the way? I don't know what a reasonable person who's petrified of her husband would tell a judge. I've never been in that position. Is that reasonable? I don't know. She was probably petrified of this guy. Isn't the trial judge hearing the criminal contempt proceeding entitled to draw inferences from her silence? No. Not in a criminal case. No, no, no. Not about the burden of proof. About her silence at that hearing in the divorce case. In the divorce case. Saying nothing about the arrest warrant out for her husband and calling the police and arranging for them to come and see her. Can the divorce judge draw inference? No, no, no. Can the trial judge, trial judges in criminal cases draw inferences all the time. Correct. Without the defendant testifying. Correct. When the trial judge in the criminal contempt proceedings heard that on September 18th, the day before her husband was arrested, she was in court before the divorce judge. Said nothing about the arrest warrant. That she called the police that day to let them know the next morning her husband is going to show up at her house to pick up their son. And lo and behold, they do show up to execute the warrant. Can't that trial judge draw an inference from that evidence? I do not think that the trial judge can draw any inferences from someone remaining silent during a hearing. That's not my question. Okay. The evidence was, forget your client had the right to remain silent, and she did. The trial judge in the criminal contempt proceedings, as trial judges in criminal cases do every day, are entitled to draw inferences from admissible evidence. The admissible evidence was she was in court on September 18th. She said nothing about the arrest warrant for her husband or the pending criminal charges, for that matter. She called the police on the 18th to let them know he would be at her house the next morning to pick up their son. Okay? Isn't the trial judge entitled to draw inferences from that evidence, which is admissible? Can the judge? I don't think against the defendant they can draw any inferences. Of course they can. They do it in criminal cases every day. Regardless of the defendant not testifying. If we're talking about the evidence, not on her silence and not testifying. Correct. On the evidence, you can draw inferences. She can draw inferences as to her guilt? She can draw inferences to her intent. I don't think she can. Do you have any case to support what you're telling us? No, I don't. To add to what Justice Mason stated, he had visitation September 10th, 12th, 15th, 17th, all those days. You're saying she's so scared and everything, but visitation went fine all those days. And then after the hearing, she called the police to show up the next day. Correct. Because they couldn't get him served. So after she was told by two judges the visitation order stands. Correct. And she didn't pipe up at either of those two occasions and say, wait, wait, wait, there's a problem here. I'm the victim of domestic battery and my children have been threatened. She didn't tell them that. Correct. And as I said before, they would have been able to consider that testimony and consider modifying the visitation order. But she didn't pipe up. She didn't say anything. So they didn't know. So they're telling her this visitation order stands. She didn't say, wait a minute, there's a problem with that. Can we talk about it? She was quiet. And then she has him arrested when he shows up for his court-ordered visitation. Correct. So she didn't have him arrested. The police officer, she told the police officer a warrant had been issued by a judge of the circuit. Who got that warrant issued? The police or the court? The court. The judge, the officer, Stanish and Debbia Mamadi went to court. Judge Bitar issued a warrant. And the officer had to serve him with the warrant. And she said, this is where he'll be. You can serve him. Was she going to have that any other time, the whole week before? I don't know if she could have or not. Why? Because she probably didn't know where he was. He came to pick up the children. Of course he didn't know where he was. That's why he was on the 19th. That's why they did it then. Because that's when they knew where he was going to be. He had visitation on the 10th, 12th, 15th, and 17th. Correct. So as famous as he was, he always picked up the child. Correct. That's why they had him served, because she didn't know where he was outside of picking up the child. Oh, I see what you're saying. Yeah, that's what I'm saying. That's the only time she was there. One of the problems here is that Judge Vitar was unaware of the background with regard to the domestic relations case, wasn't he? I don't believe that, on the record, Judge Vitar was advised of anything regarding the domestic relations case. Right. I don't know if my client and the police officer knew that they had to or didn't have to. Well, police officer… They just went and got a warrant. And Judge Vitar issued the warrant. And the officer served the warrant. And it just so happened that he missed some visitation. And spent three nights in jail. That's the system. That's not my client. I mean, who knows? I don't think she wanted him arrested. An arrest warrant? She issued an arrest warrant. She knows what an arrest warrant is. I think she knew what an arrest warrant was. But isn't that the process when somebody beats you up, that you go to court and you get a warrant issued for the arrest? She showed pictures of herself being beat up? She showed doctors' pictures? That's not the issue. The issue is an order of protection would be the appropriate way to keep him away from her if she's afraid of it like that. But she went through it the day before. So that kind of… How do you reconcile? You know, because she went to court in the criminal system that the state brings charges. She doesn't bring charges. She's a witness. She went and she went with the police officer and she told the judge what happened and Judge Bitar issued a warrant. She was a witness. Mr. Gotti, in domestic relations cases, as I'm sure you're familiar, it often involves adults behaving at their worst. And I'm sure that your client is not the first person who would like to have had their spouse arrested for something during a divorce proceeding. And the problem I think we're all having is that when parties are involved in divorce proceedings and then one of them goes off and commences something else without telling the other side, there are complications from that. And this case seems like a really good example of that. And I agree that there are complications and maybe we ought to change the rules and not allow parties to do that. But where would that go? I don't know. How would that help people? I mean, she waited. She was that afraid and she waited. The incident occurred before the divorce proceeding. Correct. So, you know, the timing, you have to look at what's going on in this case. And on the day before she says, now arrest him, here's where he's going to be, the fact is that the facts don't look good. But the issue is that it's a criminal case. I mean, sure. It looks like it's a domestic case. I'm sorry. But the facts don't look good. That's what the trial judge in the criminal contempt proceeding was entitled to draw inferences from. They don't look good. But the issue is, is there a court order, and this is indirect criminal contempt. Is there a court order that specifically lays something out, and did she violate that specific court order? That is criminal contempt. There was a court order. There was a court order of visitation. Did she violate that order? The court order did not say that you can't go get a criminal contempt action, you can't go get a criminal case filed, you can't file a criminal case and have a battle against your husband. It has to be a mandate. You don't have to say it. You shall tell your husband if you're going to a criminal court. Where did you make that argument below? What's that? Where did you make that argument below? Below? Below, yes. In the trial court. In the trial court? Yes. Remember when we said, you know, a motion to reconsider. Reconsider. It's a little late. Reconsider. You didn't make it at trial, did you? At trial? Yes. That what argument? That argument you just are making. That what criminal contempt is? Well, your argument that, you know, that she had a right to do what she did? She had a right to remain silent in the criminal trial. Wait, don't, don't, don't try to confuse the issue. We've already talked about that. There's a difference between remaining silent in a criminal proceeding and her remaining silent before a judge with regard to the underlying facts that make up the criminal proceeding. Okay. Right? You agree to that? There's a right to remain? Yes. There is a difference. There's a difference, right? Right. Okay. There's a difference between you standing here and saying nothing about something, and you being at trial and saying nothing. There's a difference. Okay. If you were testifying. No, I was saying that, you know, there has to be a clear court order that you can or can't do something to be held in direct criminal contempt. There wasn't in this case. Yeah, there was. There was. There was an order of visitation. Right. But the order did not say that you can't go call a policeman and tell him that your husband is coming for visitation. How does she know that they're not just going to process him and let him go and he's still going to have his visitation? The order also doesn't say on the day of visitation you can't take your son and secrete him someplace so that the visitation can't occur. I mean, there are all sorts of ways that somebody can circumvent a visitation order. The question that Judge Harris had to decide was what was her intent in calling the police? Her intent was to tell the police the facts, to go in front of a judge, and let the court system take its course. And the court system did. She knew it was a no-bound order. You put it on the order. I don't think she had a clue as to a no-bound order or anything like that. She just went before Judge Beethoven. Assume. People have to assume. There are certain things you have to assume in the law, right? Why would she go and have an arrest warrant issued? What did she think? Because it was the only recourse she had because her order of protection was dismissed. After her order of protection was dismissed, right? It was continued. And then she went and got it. It was dismissed on September 18th. And Mr. Minton was granted leave to seek Rule 137 sanctions. Correct. Right. So she was at the end of her order of protection strategy. Correct. And she then calls the police and says, by the way, he's coming to my house tomorrow morning. You can execute that warrant. Correct. Okay. And there's nothing in the court order that says she can't do that. This is criminal contempt. They're saying that in criminal contempt you have to violate an order. There's nothing official in the order. There is an order. There are two orders. The order says allow visitation. It says he's granted visitation the following day. Correct. Okay. He was granted visitation. She was in. There's nothing that says she wasn't in the house with the kids. He came to the house. It's not like she barricaded herself in the house with the kids and the police had a call and she denied it or she took off with the kids and left. He came to the house and the police. But the order doesn't say that either. The other, what you're saying is the order has to anticipate all the ways in which one spouse could interfere with another spouse's visitation. She could take him to the doctor. She could secrete him. She could call the police and have him arrested. None of those things are spelled out in that order, and yet all of them violate the visitation that the court admonished her on several occasions must occur. I'm just having a difficult time agreeing with the fact that her going to court and getting a warrant, the judge issuing a warrant, and a policeman serving on it, she's interfering with visitation. Well, you've already said that Judge Petard didn't know that there was a divorce proceeding going on. Correct. And he didn't, because of that, he also probably didn't know that Judge Levinson had, after hearing an ex parte emergency petition for sole custody, didn't do that, instead granted the husband visitation. And Judge Petard probably also didn't know that an ex parte emergency order of protection filing and case and hearing, which, at which the husband wasn't there, was either denied or withdrawn. So Judge Petard doesn't know any of the history of this. Correct. And any judge in Cook County, if they had known any of this, would have said, go to Judge Levinson. File an emergency motion in front of Judge Levinson. They may have said that, but the issue is that she'd have an obligation to tell him that, and that the police officer have an obligation to tell him. Well, actually, if she's worried about her safety and the safety of her children, and she's in front of the divorce judge who's deciding the visitation schedule, at that point she has an opportunity to say, Judge, there's a problem here. I feel threatened. I feel that my children are threatened. Please help me. That was the judge that was there in the divorce case writing the visitation order that's the heart of this case. Correct. And I think she trusted him. And he did not have all of the information that he needed from her either. So she's holding all this information really close to the chest and then springs it on her husband with an arrest warrant. How does that happen? Judge Levinson denied the order of protection. So what's the next thing she's going to do? She's scared. We don't know what's going on in her mind. She's a victim. She's scared. So she does the next thing. He denied it and said, go see Judge Levinson, take it up with the divorce judge. Judge Levinson wouldn't do anything. But she had an absolute right. Oh. When the judge doesn't do anything, then the litigant can take care of it. Oh. Okay. So she's judge shopping. She's not judge shopping. She's wedding shopping. That is judge shopping. That is judge shopping. No, it's not. Judge shopping would be going to another divorce judge. Well, here you've got a judge that won't listen to her and she just goes around doing it. This is a pretty different issue. The problem with everything you're saying, quite frankly, in my view, it might be a great argument. You didn't raise it before the trial judge. The problem is, and you must reconsider, you have to raise it before then. You never raised this issue, which you conceded a little while ago. So the problem with the argument, whether it's a winner or not, is forfeited.  Forfeited. Forfeited? And what argument is forfeited? You're making the argument that she, none of the orders in September. All right. Counsel, you'll have an opportunity to. Right here. We'll talk. Yep. You keep arguing that the orders regarding hesitation are separate and apart from the criminal, indirect criminal constraint. Sure. That's your argument. They are? No. Where did you make that? Below, before the trial court. You said, I made it in my motion to reconsider. It's too late. You can't make an argument that they're separate. They are separate. You said that you made it too late. Reconsideration, that means you've made it. You know, you told the trial court so they could do something about it. Reconsideration is after good rule. Correct. Yeah. You don't make new arguments. No, you don't present new facts. I mean, that's an argument that it was a simple cheat that they did not prove beyond a reasonable doubt their case. I mean, I. That's not the issue you're raising. Well, you guys are raising questions. I was just answering your questions. No, no, you're not. Because now you're talking about something different. I wasn't talking about the beyond a reasonable doubt thing. Okay. Well, if that's how you look at it, that's how you look at it. But I, you know, this case, they did not prove anything beyond a reasonable doubt. That's a different argument. Okay. Now you want to go on to that argument. Okay. Would you like me to go on to that argument? I think you have covered it. I think we've been talking about reasonable doubt a lot. Are there any other points? Let me just go to the end. You know, the trial judge made some comments. And I really believe he confused criminal contempt and civil contempt. You know, he said that Mrs. Mumani had ample opportunities to inform the court or her husband regarding the order, which is your just saying, that Mrs. Mumani had. We know that. And it was all in October, right, when he said that? That was at the trial. That was at his final hearing. In the trial, in the finding, he said there was beyond a reasonable doubt. And he also said that Mrs. Mumani had personal knowledge of each court order entered and knowingly and contemptuously violated these orders without good cause shown. When was that order entered that you just read from? When did he make that mistake? That was the motion to reconsider. That's what he said? Uh-huh. Don't try to, we know the record. Okay. Okay. I just asked you that. Right? You said it was at the trial.  It was at the motion to reconsider. I was jumping around, too. It was at the motion to reconsider. Don't jump around like that because you want us to understand, we understand the record. We've read it. Okay. We know this happened after the trial. Right? And the motion to reconsider is when? After he'd already ruled. Beyond a reasonable doubt. Okay. Beyond a reasonable doubt. Right. Correct. We haven't talked about that, but you've said, I think you just mentioned that I've talked enough about it. We have spent a long time on that. We've spent a long time, so maybe I should just close here and wait for my rebuttal. Okay. Thank you. Thank you. All right. Mr. Minton. Thank you. And please support counsel. I have listened carefully to the questions addressed to Mr. Bonney by this Court. And I'd like to suggest to the Court that a chronologically ordered recitation of the key facts, what had occurred in this case, is not only more than responsive to the questions asked by this Court, but also to the responses given by Mr. Bonney. In this case, the facts do speak for themselves. So before I address Mr. Bonney's arguments, I'd like to provide a detailed but brief chronological summary of what occurred. Actually, it's in the briefs. So I don't know if that's going to help, but I'd like to ask you the question. Mr. Bonney's making the argument that one's a criminal proceeding with regard to the domestic abuse, and the other was a civil proceeding with regard to the divorce. And she has every right to go to before a judge with regard to the abuse that she endured, physical abuse, and seek a remedy for that, or seek the state to do what is necessary because of that action. Well, of course she has that right. There was in the key events in this case, when the case was filed in July of 2015, and the notice for emergency custody and relief was presented to Judge Levinson on September the 1st, there was a four-page order entered with reference to the allegations that she had made in her petition for temporary custody, which cited only the May 30th incident and none other. And this order was entered. It was approved by her, actually initialed by her, entered by agreement. And that order, Your Honor, did, in fact, it was a four-page order. I just want to clarify. Are you saying that the bed that she signed initialed, it described the May 11th incident? Yes, Judge. Excuse me. The May 11th incident that had occurred about three and a half months prior. And Judge Levinson commented on that, of course. But she did brought it up to the counsel. She had brought it up before. Totally. So, yes, she had had an attorney at that time, Attorney Allen Gates. She signed that order, the reference to the, Pradeep having parenting time, set forth exactly the dates that Your Honor had stated. She then, within- But are you saying that that order also stated that there had been an incident on May- Oh, no, not the order itself, the underlying petition. The underlying petition, did she sign that? She had actually filed that petition in front of Judge Levinson. That was one of the petitions. This was the emergency order for sole custody? Yes. Okay. And then that four-page order was actually- And that's within the divorce case? Yes. Right. And then the day after that order was entered, that she agreed to have it, that was approved by her attorney, four pages in length. She then filed an independent order of protection proceeding. An emergency order. Yes. Ex parte. The next day. Yes. Before Judge Greenblatt. Right. And I think that's extremely important, as we cited in our brief, with reference to Judge Greenblatt's comments to her when he was not only very critical of her being in a courtroom one floor above Judge Levinson's courtroom, but actually entered an order consolidating that case. Oh. Yes, it was an order entered consolidating that case that she had filed and transferring it back to Judge Levinson. That order was entered by Judge Greenblatt. And did he set a date? Yes. Okay. That was September the 9th. Okay. And at that time, Judge Greenblatt stated to her in court, well, she agreed. There's no allegation that your child isn't safe, or else she wouldn't have agreed to allow your husband to visit the child. The court, here's what's going to happen. I'll give you leave to file your petition for the emergency order of protection. I will leave your petition on file but consolidate it before the divorce judge. We don't want proceedings, he said, in two separate courtrooms involving the same matter. And the court looked right at her and stated, you have to comply with the order here unless you want to serve him sooner. In her petition for the order of protection, in speaking just briefly, she missed the address of her husband. This was it. Also, she knew exactly when her husband was going to be in court. After she, without notice to anyone, including her own attorney, went on September the 8th, just a couple days after Judge Greenblatt consolidated the cases, went on September the 8th with Officer Stanich. And it's interesting to note, and I think the court can understand this, Judge Greenblatt stated that, again, ask the judge for the relief that way. You'll have everything in front of them rather than two judges from two different courtrooms. One judge will hear everything. And then he went further to state again that there's no allegation with reference to any endangerment. But as I understand their argument, it's really irrelevant to what they're saying. They're saying she went in to court for the arrest warrant regarding a domestic abuse situation. That doesn't have anything to do with the visitation. It doesn't have to do with her child. It had to do with her. Yes, Judge. And it also recited in the emergency order, as part of the order of protection petition, the same event that was recited in the emergency petition for temporary custody before Judge Levinson. Judge Greenblatt sent her back to Judge Levinson. It was set for a hearing then on September the 9th. Now, in the meantime, she then appears in front of not Judge Greenblatt, who had just sent her back to Judge Levinson. But the rules in the district in Ronald Meadows, you can call every single day and see what judge is hearing orders of protection. Judge Greenblatt, the only day that he was not hearing petitions for order of protection was September the 8th. That's when Judge Beechar was sitting, who had no knowledge six days earlier that, I'm sorry, no knowledge that, in fact, Judge Greenblatt had consolidated the case that this same victim had appeared in front of Judge Greenblatt. Judge Greenblatt sent the matter back to Judge Levinson. The case was made in the September 1st hearing. I understand that. They're saying that she has an independent right. As does anyone have an independent right, but the facts of this case show that not only did she agree to an order before Judge Levinson and not follow it, but then when she filed an emergency order of protection involving the same incident in front of Judge Greenblatt, who consolidated it and sent it back to Judge Levinson, she then went in front of yet another judge who was sitting in for Judge Greenblatt and presented a petition, or I should say a basis for the issuance of an arrest warrant. She went to the police. I don't know. The police testifies what she told her. The police standish. But he wasn't aware of those situations. But does he have to be? Does the judge have to be with regard to the divorce? For the issuance of the warrant, I don't know. That's the regulation. No, that's the regulation. I would think the next day after the issuance of the arrest warrant, when she was in court on September the 9th before Judge Levinson for the hearing, the arrest warrant had issued. Her husband was in court also. Judge Reedman was in fact sitting in for Judge Levinson. On September the 9th, she stood in court, and she in fact entered into an agreed order after being severely reprimanded by Judge Reedman. That's on the record, part of the court record. She agreed that he will have the visitation as set forth in these court orders, and she agreed to abide by that court order. She did not. If you have a domestic abuse, there's a warrant. Their argument is it's independent of the visitation. I believe that's their argument. Well, Judge, the first of all— Doesn't she have a right to do that? Yeah, well, of course she does, Judge. Looking at the system and how it works, whether it's gaining the judicial system and making arguments, bootstrap arguments, what had occurred— We don't have a sophisticated individual. We don't have someone with the law school who understands American legal system necessarily. She's scared. Judge, I understand that she was scared. She also had at all times represented by counsel. She was in court when Judge Greenblatt consolidated the matter alleging the same incident of domestic abuse, sending it back to Judge Levinson. When it went back to Judge Levinson and he was not there, Judge Reedman heard it and, again, entered an order. She said nothing. She said nothing about the arrest warrant being issued. If in fact she intended her husband to be arrested, she could have done it the next day. She could have done it during any periods of visitation that he had exercised unobstructed with the child. She could have done it at any time at all. But she chose not to because she was waiting. She was waiting for the hearing, which was three and a half hours, on September the 18th to see what happened at the hearing. During that hearing, she was represented by Mr. Boddy's office and at that time they petitioned for the order of protection. And I will state that I've known Mr. Boddy for a long time. He had no knowledge of the warrant for arrest. And we entered into an order after three and a half hours of hearing that, in fact, the petition for the order of protection was, it says, dismissed slash withdrawn. But the case itself, the OP case, was dismissed. And after that order was entered, and a very extensive order entered on September the 18th, then and only then did she contact my phone as she was walking out of the courtroom after having agreed to the visitation, having been, again, the record will show what Judge Levinson advised her of with reference to his parenting. And so the father, armed with not only the court order of September the 1st, the court order of September the 2nd, the court order of September the 9th, and the court order of September the 18th, goes to visit with his son on a Saturday at 9 a.m. only to find out that all of the court orders that he had and being in court three and a half hours the day before, no one had been informed. Counsel's argument is she doesn't have an obligation. She does have an obligation to respect the judicial system and not to lie to three different judges. Judge. But she didn't lie. She didn't say anything. Oh, yes, Judge. She did, in fact, agree to abide by the terms of the visitation orders entered. And when you bring the court's attention in the Beth's case, and it's the background on what really is criminal contempt, and it covers the entire gamut of disrespectful, disruptive, deceitful, and disobedient acts or failures to act which affect judicial proceedings. And when Pradeep was arrested in front of his son on Saturday with a warrant that no one knew anything about except her and Officer Stanis and Judge Bitar, wasn't known to Judge Ringblatt, wasn't known to Judge Levenson, wasn't known to Judge Reitman. And then he was arrested, and Judge Bitar had sent a no-bail order. So he was transported to 26th and California, was unable to have a hearing on Saturday, Saturday night, Sunday, Sunday night, Monday, Monday night. Finally, on Tuesday, after three days and three nights, well, four days and three nights at 26th and California, he was released, and subsequent order entered in the criminal proceeding, dismissed the petition, dismissed the criminal case pending against him. It was dismissed with her in open court, being questioned by I've forgotten which judge, but the order is part of the court record. The criminal proceeding, she had gotten what she wanted. She had gotten her husband arrested. And the circumstances, Judge, and the only, as Judge Harris said, defendant's conduct has impeded, embarrassed, obstructed the court's effective administration of justice and has brought the administration of justice into disrepute. One of the reasons why the case was transferred to Judge Harris is because she had appeared in front of every available judge in Rowing Meadows. There were no other judges to go to. And so the matter was sent down to Judge Harris. The arrest, what, was based on the incident that happened in the previous march that she'd already tried to get an order of protection based on? Yes, Your Honor. So the same set up, it wasn't some new incident that happened between the last time he saw the children and that Saturday morning. That's correct, Your Honor. There's nothing new that happened. Yes. It's the same thing. So now she said three judges consider the same incident. Yes, and Judge Greenblatt. And still give him visitation. Yes, and Judge Greenblatt even asked her, is there any incident, what is the, have there been any incidents since May, three and a half months ago? She said, no, that's the most recent incident. Okay. Now, in the brief, Mr. Brady talks about how Judge Harris says, oh, I wish she had said that during the case in chief. That was because at that point, at the point that she's explaining why she's doing all this stuff, there's no opportunity for her or her husband to be cross-examined on what she's just said. It's after the case is over. Oh, yes. This is her argument in favor of mitigating her sentence. It was in the application hearing. So I can see where Judge Harris would be frustrated and say, oh, if we had this in the case in chief, we would have had an opportunity to explore it with cross-examination. That is now not an option. Correct. When the trial was conducted on September 21, 2016, and it's very important because it's part of the court record, the September 21st order entered upon the conclusion of the trial found, and I quote, the respondent defendant being the same as found guilty beyond a reasonable doubt of the offense in direct criminal contempt. The transcript on September 21st, likewise shows that the conclusion of the trial, Judge Harris recited a summary of the fact findings, which supported the court's ruling and stated, and I quote, so I do find that the defendant in this case is beyond a reasonable doubt. I find that the defendant is guilty of violating the September 1st and September 8th orders, and there's a finding of guilty. Nowhere in the September 21st transcript or order does the judge make any reference, and it's critical, does make any reference to any, quote, failure to show cause or any burden being placed on the defendant, nor did the judge ever say that the defendant had any obligation to testify or to present evidence, and that is the fact that the defendant elected not to put on any evidence at the trial. If Judge Harris had mistakenly believed the applicable legal standard and placed the burden of proof or production on the defendant, that would have been the first thing that the judge said, right there on the spot in support of his ruling, but it was not. The defendant argues that the October 20th order, which was entered by the court, heard the same. After the court heard the defendant's motion for reconsideration, it includes the words, without good cause shown. That's the argument. But the very same order states, and it's one of nine subparagraphs, it is therefore ordered the judge that the defendant, after being given an opportunity to make a statement in allocation, be and is thereby found guilty, beyond a reasonable doubt, to the offense of minor indirect criminal contempt. And the fact the judge said that after hearing the allocation statement, that he wished that she had testified at trial, only indicates that the judge believed the testimony helped her, not that she had any burden to offer that testimony. And I think that speaks quite clearly to the point that they raise in their brief. And the reason why I provided the chronology of facts is because they do speak to me. I mean, the number of judges and courtrooms on two different floors in Rolling Meadows show, and this was a criminal trial. The defendant engaged in a series of calculated and willful actions intended to circumvent the rulings she was getting from each court. But she agreed to it. She was present in court. I agreed to do this. As Judge Harris found in the October 20, 2016 order, the defendant's conduct impeded, embarrassed, and obstructed the court's effective administration of justice. So in this brief, the defendant filed an emergency petition for rest. It was based completely on the allegations of domestic abuse that occurred three and a half months earlier. The motion was heard. The order was entered. Scheduling parenting time three days a week. That was the September 1st order. So unsatisfied with that order, she did two things. First, she picked up the phone and called the Roselle Police Department. This was linked to one of the court orders where the court order stated that the law firm would contact the Roselle Police Department to be sure that there was nothing outstanding. Oh, yes, that's part of the court order. And reported the May 11th domestic abuse incident. Second, she filed a brand-new case the very next day in front of a new judge, Judge Greenblatt, in a different courtroom, Room 206, asking for a new order overruling the parenting schedule of September 1st. When she appeared on that petition, she was told the petition was improper. She was ordered to comply with the parenting schedule by Judge Greenblatt. She was told to go back to Judge Levenson if she wanted relief from the court order parenting schedule. A few days later, she doesn't do that. A few days later, she goes into the Roselle Police Department. She goes into court, and for some reason, Judge Greenblatt's not there with Judge E. Tardis. And she appeared before the office of defense, arrest warrant, telling the judge about that and not informing that judge. Not that she has an obligation, Your Honor, but she didn't inform the judge of anything that had been going on in the divorce proceedings or the fact that she had previously appeared before Judge Greenblatt just six days earlier. So ten days after that, well, then there's September the 9th, and we appear again, all parties present, in front of Judge Riedman. Judge Riedman asks the same questions. And the implicitation order will be enforced. She speaks nothing about the arrest warrants that she had issued the day prior by Judge Vito. And, incidentally, she was under oath. She was just finally under oath. Oh, yes. Yes, Your Honor. And there's that part about the truth, the whole truth, and nothing but the truth that she'd already sworn to? Yes, Your Honor, that she had several times previously. Yeah, that whole part always sort of gets to me. Mr. Minton, this sounds like the facts that you wanted to bring us through at the outset of your argument, and we are aware of them. We are very cognizant of the sequence of events here. Is there anything else? Thank you. Judge Buczynski? No. All right. Thank you. Thank you. Mr. Boddy, rebuttal? Briefly. I did have an opportunity to look at the record again, and Officer Stanisch did testify on page 28 of our brief. He testified that Ms. Divia was forthcoming about the visitation order in place, so she told the police officer. So she appears in front of Judge Vito with this police officer, probably in his uniform. She's standing there before the judge, probably in a row. She gives testimony with the police officer standing next to her, and Judge Vito issues a warrant. But the record does not reflect that Judge Vito has told anything about the visitation order or the history of the emergency order protection, et cetera. She told the police officer, and now you have to think as a lay person, not as a lawyer, not as a judge, a woman who was scared. She told the police officer, that's a foreign. She told him. I don't know what was going on in her mind at the time, whether she or he. But that was what Judge Harris had to decide, what was going on in her mind. I mean, there's never or almost never any direct evidence of somebody's intent, but that's what he had to decide in the indirect criminal contempt proceedings. He had to decide in calling Officer Stanich and telling him that her husband would be there the following day to pick up their son, was she intending to flout the visitation order? That's what he had to decide. I think that he may have thought like that with Judge Harris, and that's what he was saying. But the bottom line is, and we've talked about it before, is beyond a reasonable doubt, that order that said these are the times for visitation, her actions have to directly contradict that order. Okay? Her actions didn't do anything. She was sitting in the house with that child. The police officer was sitting outside. The police officer was, and I argue all of this. I mean, people act in concert with other people all the time. It doesn't relieve them of the responsibility of their actions. When you have a policeman, and you have a policeman that you told there's this visitation schedule, and the policeman takes you to the judge, and he's authoritative, and when the policeman testified that he didn't, he tried to get him to talk to him. He wouldn't talk to him, which he has every right to do, too. He has every right to remain silent, too. And the policeman is sitting outside the house, and the policeman chooses that time to arrest him, knowing that there's a visitation order in effect, because the policeman knew about it. How is she guilty of indirect criminal contempt is the question I put. What did she do to affirmatively go around that order? She just told the policeman. She said this is where he's going to be. The police said, no, I'm not going to interfere with a visitation like that. I'm not going to do it. It could stop him from having a visitation. They didn't do that. So she's then being victimized because of what everyone else did. She's going to leave the court. You know, I need some help here. But she thought the system was helping her, and all of a sudden she's the victim. I don't think that's right. But I don't know if you have any more questions. No, no. Thank you. Thank you. We also have outstanding the matter of the rule to show cause against Mr. Minton. We have your response. It seems to be an unfortunate confluence of errors here. One on our side in the computer system. I don't know how the computer system picked up your old address, but it did. The other problem was your failure to respond to the calls from the court. And so those unfortunate events led us to have to reschedule this argument. And collectively, we apologize for what I'm sure was preparation you had engaged in up to and before the argument on June 12th. But we have resolved the matter, and we have your briefs. We have your excellent arguments today. We thank you for that, and we'll take the matter under advisement. Thank you.